Clifford EDWARDS, Sr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 79–92–E.

United States District Court, M. D. Alabama, E. D.

Sept. 3, 1980.

Ruth S. Sullivan, Dadeville, Ala., for plaintiff.

Barry E. Teague, U. S. Atty., Susan B. Bevill, Asst. U. S. Atty., Montgomery, Ala., for defendant.

## OPINION

HOBBS, District Judge.

In this action, plaintiff seeks damages against the United States (acting through the physicians at the Veterans Administration Hospital in Tuskegee, Alabama), for malpractice, alleging that he has developed glaucoma as the result of negligence arising out of a cataract operation performed in December 1975, at the Tuskegee Veterans Administration Hospital. The Court is of the opinion and so finds that plaintiff has failed to prove by a preponderance of the evidence that the doctors at the Veterans Administration Hospital were guilty of any negligence or lack of care in the operation on the plaintiff and his subsequent treatment.

## OPINION IN LIEU OF FORMAL FINDINGS AND CONCLUSIONS

Plaintiff Clifford Edwards, a fifty–six year old veteran, was admitted to the Veterans Administration Hospital at Tuskegee, Alabama, on December 15, 1975, for removal of a cataract on his right eye. Surgery was performed on December 17, 1975, by Dr. M. F. Estrada. The operation was "average," and plaintiff's recovery period began progressing uneventfully. On December 28, however, examination of plaintiff's eye revealed a flat anterior chamber.

The anterior chamber of the eye is one of two chambers which are filled with a clear, colorless fluid which flows between them through the pupil. The posterior chamber is the other and larger chamber of the eye. Under normal circumstances, the pressures within the anterior chamber and the posterior chamber are equal, since the fluid flows freely between them. If the anterior chamber becomes flat, fluid flow is restricted and may cause higher pressure within the eye. Such pressure is one of the characteristics of glaucoma.

Expert testimony at trial and in depositions agreed that a flat anterior following cataract surgery has numerous possible causes, among the possibilities would be a leak from the stitches placed at the time of surgery, trauma to the eye, over–activity on the part of the patient, and pupillary block.

There is no evidence that plaintiff's activity following surgery created or aggravated the problem of the flat chamber.

The development of a flat anterior chamber is not a frequent, but it is not a rare, complication. The doctors all agreed that the development of a flat chamber following surgery is not a basis for concluding that the surgery was lacking in skill or care.

Upon discovery of the flat anterior chamber, the Veterans Administration physicians began applying conservative therapy in an attempt to reform the chamber. Plaintiff was confined to bed, a pressure patch was applied to the eye, and medication was administered.

The progress of the eye was carefully monitored by the staff of the VA Hospital. The medical records reflect that on December 29, the day after discovery of the flat anterior chamber, the chamber was slightly deeper. On December 30, the chamber was again flat and surgery was scheduled. That day the patient was presented to Dr. S. H. Settler, the Chief of the Ophthalmology Department of the Veterans Administration Hospital. Dr. Settler directed that two stitches should be removed, noted that the conservative treatment should be continued for five days, and cancelled the surgery. Pursuant to Dr. Settler's direction, the next day certain sutures were removed and the chamber remained flat.

On January 1, an increase in the depth of the chamber was noted in the morning and a further increase in the afternoon. On January 2, the chamber was shallower. Later that day it became deeper, and remained the same the next day. On January 4, the chamber was noted to be deeper, and on the fifth day, it was noted to be the same as the previous day. On January 6, the plaintiff demanded discharge from the VA Hospital, was released, and that evening checked into Russell Hospital in Alexander City where, on January 8, 1976, Dr. Frank Burns surgically reformed the chamber.

Dr. Burns next saw plaintiff on June 29, 1976. Prior to this visit, plaintiff had been fitted with contact lens by Dr. Archer, an optometrist, and Dr. Burns referred the plaintiff back to Dr. Archer, who refitted the contact lens.

Dr. Burns next saw plaintiff on March 23, 1977, and testified that vascularization of the cornea had developed, the contact lens had been discontinued, and he diagnosed glaucoma because of the increased pressure in plaintiff's right eye.

In April of 1977, plaintiff went to New Port Richey, Florida, to have a lens implanted in his right eye by Dr. James Gills. When Dr. Burns next saw plaintiff on August 31, 1977, plaintiff's vision in his right eye was 20/25, and his pressure was normal, presumably the pressure was controlled by medication.

On April 21, 1978, plaintiff was examined by Dr. M. Dale Smith, an ophthalmologist practicing in Gadsden. Dr. Smith found plaintiff's corrected vision to be 20/30 in his right eye. He diagnosed plaintiff's eye as afflicted with well controlled glaucoma.

Plaintiff was again examined on July 10, 1980, by Dr. Ralph Levene, a practicing ophthalmologist in Birmingham. Dr. Levene reported that in December, 1978, plaintiff had returned to Dr. Gills in Florida, to have a cataract removed from and an intraocular lens implanted in his left eye. Dr. Levene expressed the view that plaintiff had a mild glaucoma but noted good visual acuity and no disc or visual field changes. Dr. Levene expressed his opinion that pressure in the right eye was well controlled on medication and noted that since January, 1979, the pressure in plaintiff's right eye had been lower than the pressure in plaintiff's left eye. He concluded that plaintiff's prognosis was good. He did express the opinion that "the delay in the surgical reformation of the flat chamber in the right eye after cataract extraction probably played a role in producing a mild second glaucoma in that eye."

As early as December 13, 1977, plaintiff was examined by Dr. Robert Morris, Chief of the Ophthalmology Department of the Veterans Administration Hospital in Birmingham, and Assistant Professor at the University of Alabama in Birmingham, Department of Ophthalmology. Dr. Morris found that plaintiff had 20/25 corrected vision in his left eye, and 20/40 corrected vision in his right eye. He found no functional damage to plaintiff's eye.[1]

Dr. Morris testified at trial. He had read the depositions and reports of the other doctors as well as having examined the plaintiff and studied plaintiff's hospital records at the Veterans Administration. It was the opinion of Dr. Morris that the surgery performed at the VA Hospital to remove the cataract could not be deemed deficient. He was of the opinion that Dr. Settler's judgment to wait to see if the chamber would reform itself was proper. He acknowledged that other ophthalmologists could reasonably conclude that the surgical procedure to reform the chamber should have been undertaken prior to the date plaintiff elected to leave the hospital, but Dr. Morris would have recommended the same course as recommended by Dr. Settler. Dr. Morris read from a recent and authoritative text[2] on cataract surgery, which also recommended a course of waiting which was consistent with the conservative treatment accorded the plaintiff.

All the doctors agreed that the surgery to reform the chamber is attended with risk to the health of the patient and should not be attempted if there is a reasonable prospect of the chamber reforming itself. The doctors were in agreement that if the chamber showed evidence of deepening, the surgery should be delayed. In the case of plaintiff, the chamber showed evidence of deepening for several days prior to the date plaintiff elected to leave the hospital.

■ The decision to delay surgery was a judgment decision and the evidence is not persuasive that the judgment exercised by Dr. Settler was in error.

■ The applicable law for a case brought under the Federal Torts Claim Act is the law of the state in which the alleged negligent act took place.

In *Sims v. Callahan*, 269 Ala. 216, 112 So.2d 776 (1959), the Alabama Supreme Court stated the controlling law. "Where there are various recognized methods of treatment, the physician is at liberty to

---

**1.** Dr. Morris testified that results from cataract surgery "are deemed good with sight restored to 20/40 and 20/50 to 20/80 is viewed as variably successful." Plaintiff's records showed 20/20 test results on right eye two to three years after the surgery at the VA Hospital.

**2.** "Many surgeons consider operative intervention advisable if the process [wound leak] has not been reversed in five to seven days. . . . Our results with air injection and posterior sclerotomy, however, have been unsatisfactory, and we usually do not resort to any intervention for at least ten days." Duane, *Clinical Ophthalmology*, Vol. 5, p. 11, Harper & Row (1976).

follow the one he thinks best, and is not liable for malpractice because expert witnesses give their opinion that some other method would have been preferable." 112 So.2d at 783.

Several doctors have expressed the view that the plaintiff has glaucoma in the right eye. Dr. Morris testified that three conditions must be met before one can properly diagnose glaucoma. Again he read from an authoritative treatise on glaucoma by Dr. Becker to the same effect. The first condition is damage to the optic nerve, the second is impaired field of vision, and the third is pressure.[3] Dr. Morris testified that he made a full examination of plaintiff's eye to determine whether the optic nerve is damaged or the field of vision is impaired. He found that plaintiff's optic nerve is not damaged, and his field of vision is not impaired. Dr. Morris expressed the conviction that other doctors who gave the diagnosis of glaucoma had not conducted an examination of the optic nerve and had not noted the unimpaired field of vision. Plaintiff has the last characteristic of pressure. But since two of the three requisites for a diagnosis of glaucoma are absent, Dr. Morris is of the opinion that plaintiff does not have glaucoma.

Moreover, for at least two reasons, Dr. Morris is of the opinion that if plaintiff can be viewed as having glaucoma in his right eye, the cataract surgery and treatment at the VA Hospital did not cause it. First, Dr. Morris pointed out that the pressure in plaintiff's left eye has been noted as greater than that in his right eye. Since pressure is the only characteristic of glaucoma which is present in either of plaintiff's eyes, and since plaintiff's left eye has greater pressure than his right, it is illogical to ascribe the pressure in the right eye to the cataract surgery or treatment of the right eye at the VA Hospital. Second, plaintiff has had contact lenses and a lens implant which in Dr. Morris' opinion are complicating procedures to any diagnosis that prior surgery caused plaintiff's present problem in the right eye.

■ In the instant case, the defendant, through its Veterans Administration physicians, owed a duty to plaintiff, a veteran, to treat him in accordance with the applicable standard of care. This standard is specifically prescribed in § 6–5–484, *Code of Alabama 1975*, which provides:

*Degree of care owed to patient.*

(a) In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community.

(b) Neither a physician, a surgeon, a dentist nor a hospital shall be considered an insurer of the successful issue of treatment or service.

This standard of care is a codification of the law found in the Alabama court decisions. In particular see *Lea v. Family Physicians*, 517 F.2d 797 (5th Cir. 1975); *Riddlesperger v. United States*, 406 F.Supp. 617 (N.D.Ala.1976); *Parrish v. Spink*, 284 Ala. 263, 224 So.2d 621 (1969); and *McKinnon v. Polk*, 219 Ala. 167, 121 So. 539 (1929).

■ The Court finds the testimony of Dr. Morris persuasive that the condition of pressure in plaintiff's right eye was not caused by any procedure or treatment of plaintiff by the VA Hospital. The evidence does not establish that defendant or its medical staff "[failed to] use that degree of care, skill and diligence used by hospitals generally in the community."

A judgment will be entered in accordance with the foregoing opinion.

---

**3.** Kolker and Hetherington, *Becker–Shaffer's Diagnosis and Therapy of the Glaucomas*, C. V. Mosby Company (1970).